| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | Not For Publication |

In re:  :  Chapter 11

243RD STREET BRONX R&R LLC,  :  Case No. 11 B 13321 (ALG)

Debtor.  :

DECISION IN RESPECT OF CONFIRMATION OF DEBTOR'S CHAPTER 11 PLAN

This contentious chapter 11 case, regarding a multifamily residential building in the Bronx, came on for a hearing on confirmation of the Debtor's Second Amended Plan of Reorganization on November 15, 2012. The Plan proposes to reinstate the mortgage debt held by the secured creditor, 243rd Street Lender LLC (the "Secured Creditor"), so as to render the creditor unimpaired. Other parties are treated as follows: New York City lien charges and other priority claims are to be paid in full; lien claims held by three suppliers and unsecured claims are to be paid in full over four years, without interest; and equity is to retain its interest. The Plan is to be funded by an equity contribution made by the old equity together with a substantial increase in the rent paid by the Debtor's principal tenant. Other than the Secured Creditor, all creditors who voted accepted the Plan; the Secured Creditor rejected it.

The Secured Creditor initially raised numerous objections to confirmation. At the conclusion of the Confirmation Hearing, the Secured Creditor's objections had been substantially narrowed, and the Secured Creditor's counsel stated that "the secured creditor has no problems with reinstatement." (Tr. of Hearing of Nov. 15, 2012, at 1:16-17). The Court found on the record that the Plan satisfied all of the conditions to confirmation of § 1129 of the Bankruptcy Code, "leaving in dispute the provisions of [sections 1123 and 1124] relating to reinstatement of debt." (Tr. 164 at lines 9-10). The remaining issues raised by the Secured

Creditor consisted of the Debtor's obligation to pay default interest and late fees, the amount of the lender's attorneys fees, and certain other expenses and charges. The remaining matters raised by the Debtor appeared to be limited to these issues as well. Nevertheless, after settlement negotiations subsequent to the confirmation hearing had broken down, the Court received a pleading styled an "Objection to the Mortgagee's Proofs of Claim" in which the Debtor sought to expunge the Secured Creditor's claim altogether or reduce it substantially on the ground that the creditor had acted in bad faith and unlawfully interfered with the Debtor's workout and/or settlement negotiations with a prior holder of the mortgage. After the Court raised a question as to the timeliness of this objection, the Debtor proposed to withdraw it but to retain the right to sue the Secured Creditor for damages in State court subsequent to confirmation of the Plan. The Secured Creditor has objected.

In the following decision, the Court first deals with the terms on which the debt can be reinstated, and then with the issue of bad faith and unlawful interference.

1. Default interest.

Section 1124 of the Bankruptcy Code "permits a debtor to reinstate debt in connection with confirmation of a Plan by curing any existing defaults and reinstating the maturity of the debt, without altering the legal, equitable or contractual rights of the debt holder." *In re General Growth Properties, Inc.*, 451 B.R. 323, 327 (Bankr. S.D.N.Y. 2011). The cure includes the payment of interest, and the general rule is that a creditor is entitled to claim prepetition interest at the contract rate as permitted under state law. *In re 785 Partners LLC*, 470 B.R. 126, 131 (Bankr. S.D.N.Y. 2012). Prepetition interest at the contract rate includes, ordinarily, the higher rate triggered upon an event of default and, where the parties to the agreement are sophisticated

11-13321-alg    Doc 122    Filed 03/21/13    Entered 03/21/13 16:45:10    Main Document
      Pg 3 of 11

and there are no issues of overreaching, such higher rate is not considered a "penalty." *Id*. at 131-132. Under such circumstances, a creditor is able to claim prepetition default interest determined under state law. *Id*. at 133.

In the case at bar, sophisticated parties agreed to the default rate of interest of 11.52%.[1] There is no assertion that the rate is a penalty, and no evidence of overreaching; as further discussed below, the Secured Creditor is accused of wrongdoing in connection with its acquisition of the Loan and Mortgage from the prior lender, Citibank, N.A., not in connection with the setting of a default interest rate under the loan, agreed to by the Debtor and Citibank. Accordingly, the Secured Creditor is entitled to prepetition default interest of $291,488.

The principles regarding payment of post-petition default interest are different.[2] In any event, by letter, dated January 14, 2013, the Secured Creditor withdrew its request for post-petition interest of $660,174 and that issue has accordingly been resolved.

2. <u>Late charges</u>. ($96,437).

In *In re 785 Partners LLC*, 470 B.R. at 137, the Court held that "[t]he decisional law is uniform that oversecured creditors may receive payment of either default interest or late charges,

---

[1] The default rate was calculated by increasing the 6.52% contract interest rate by the lesser of (a) the maximum rate of interest permitted by law, or (b) the greater of (i) five percent (5%) above the 6.25% rate or (ii) five percent (5%) above the Prime Rate.

[2] Although § 502(b)(2) disallows a claim for unmatured post-petition interest, pursuant to § 506(b), an oversecured creditor is entitled to post-petition interest on its claim up to the value of its collateral. *Id*. at 133-134. The Court found in its *General Growth* decision, now on appeal, that there is a presumption that the contract rate will apply, § 506(b) does not specify an interest rate for the claim, and allowance of post-petition default interest is subject to equitable considerations. *General Growth*, 451 B.R. at 326. Equitable factors considered in determining post-petition interest include whether (i) the debtor is solvent; (ii) the increased interest rate can be categorized as a penalty; (iii) the creditor engaged in misconduct; (iv) payment of such rate would cause harm to other unsecured creditors; or (v) payment of the default rate would materially impair the debtor's fresh start. *Id*. at 327-28. When these factors are absent, courts are reluctant to modify private contractual agreements concerning post-petition default interest rates. *Id*. at 328.

but not both." 470 B.R. at 137, *quoting Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) (other citations omitted). The reason is that both forms of compensation redress the same injury, and an award of both would result in a double recovery. *Id*. This conclusion is premised, in part, on the Bankruptcy Code § 506(b) requirement that only *reasonable* fees be allowed. *Id*. As the *785 Partners* Court noted, it is also based on the premise that late charges are intended to compensate the lender for the administrative costs of dealing with late payments under the relevant loan documents. In this case, the acceleration letter was dated December 1, 2010 but the secured party installed a receiver and effectively controlled the rent received from tenants. Under these circumstances, the lender effectively controlled the flow of funds and the costs were the costs of its own agent (who will presumably be paid out of the flow of funds).

In its closing statement, the Secured Creditor recognized that the courts have treated late charges as a substitute for default interest. Speaking of his client's rights under the loan documents, counsel stated, "And that [the Secured Lender's] bargained for position has - - permits default interest, and certainly prepetition default interest based upon the loan documents, late charges which are in the documents, and just as a footnote to the last charges, I would  - - if the Court in its ruling would not provide for default interest that we ask that the Court give late charges in the alternative." (Tr. 157 at lines 4-10). As the Court has allowed the Secured Creditor prepetition default interest, it will not award duplicative prepetition late charges. As for post-petition late charges, the property was in foreclosure and the receiver was in place, and the Secured Creditor should not receive late charges under these circumstances for administrative costs in dealing with a displaced borrower's late payments that it did not incur.

3. <u>Attorneys fees</u>.

At the time of confirmation, the Secured Creditor sought legal fees of approximately $150,000. The Debtor objected to the reasonableness of the fees, but did not dispute that they are payable under the loan documents and are cure amounts under § 1124(2)(C) of the Bankruptcy Code. However, the Court is unable on the existing record to determine the reasonableness of the fees requested. The Secured Creditor is accordingly directed to file a detailed statement of all legal fees sought, showing hours billed and billing rates. The Debtor can interpose specific objections, after which the Court will issue a ruling on this issue.

    4. <u>Lender's Advances, Taxes</u>.

There is no dispute that the Debtor is responsible for covering the lender's protective advances, which amount to approximately $17,613, including interest. The Debtor is also responsible for a substantial sum for past due property taxes. It was suggested at the confirmation hearing that the past due taxes should be paid immediately out of an escrow account held by the receiver appointed in the State court foreclosure action and left in place post-petition by consent of the parties and order of this Court entered September 6, 2011 [Docket no. 15]. Subsequent to the hearing, a portion of the tax obligation was paid; the Debtor's monthly operating statements reflect that on January 30, 2013, $377,267.55 was paid towards property tax obligation. The confirmation order should specify remaining amounts due for taxes.

    5. <u>Outstanding Code Violations</u>

The Debtor's position at confirmation was that outstanding violations on the property were not material and would be cured over time in the ordinary course of business, if the Plan were confirmed. There was testimony about the nature of the violations and whether the total amount was overstated. The property manager for the building appointed by the receiver

5

testified convincingly that he had cured all Class "C" violations, which relate to health and safety issues, and that the remaining violations were manageable and had been properly managed by the receiver during his stewardship of the property. It is concluded that the violations can be dealt with in the ordinary course of business post-confirmation and do not affect the feasibility of the Plan.

      6. <u>Overreaching and Bad Faith</u>

As noted above, notwithstanding that the Debtor brought its own plan on for confirmation and proposed to reinstate the Secured Creditor's debt, after the confirmation hearing it filed a wholesale objection to the Secured Creditor's proof of claim, contending that the claim should be expunged or reduced to the amount that the Secured Creditor paid Citibank, the prior holder of the mortgage on the Debtor's property. After the Court questioned the timeliness of the objection, the Debtor proposed to withdraw its objection to the proof of claim but to reserve the right to sue the Secured Creditor (and other third parties) in State Court for damages.

Any such damage action against the Secured Creditor would be inconsistent with and barred by the res judicata effect of the confirmation order. A confirmation order is preclusive and binds both the debtor and creditors to all claims and causes of action determined by the Plan.[3] *In re Heritage Hotel Partnership I*, 160 B.R. 374, 377 (9th Cir. B.A.P. 1995), *aff'd*, 59 F.3d 175 (9th Cir. 1995) (unpublished, table); *Rainbow Trust v. Moulton Constr.*, 200 B.R. 785 (Bankr. D. Vt. 1996) *on reconsideration*, 207 B.R. 70, 73 (Bankr. D. Vt. 1997) (reaffirming the

---

[3]Section 1141(a) of the Bankruptcy Code provides, in relevant part, that "the provisions of a confirmed plan bind the debtor . . . and any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan . . . and whether or not such creditor . . . has accepted the plan."

preclusive effect of plan confirmation but reconsidering other issue).

In this case the Debtor's Plan proposes to reinstate the debt and cure all defaults, as required by § 1124.[4] The Plan did not propose to expunge or equitably subordinate the Secured Creditor's claim or to pay only part of the arrearage. The Disclosure Statement represented that the estimated cost to reinstate the debt would be $885,165 at the non-default rate of interest of 6.52%, and $1,563.973 at the 11.52% default rate. Reservation of the right to sue the lender for prepetition damages would constitute a collateral attack on the confirmation order and Plan. As the Court held in *In re Howe*, 913 F.2d 1138, 1147 (5th Cir. 1990), where a creditor's claim is specifically treated in a plan and the debtor had an opportunity to challenge such claim, "the debtor cannot collaterally attack the bankruptcy court's decision . . . in an action based on the same transaction." Similarly, it has been held that a debtor's lender-liability claim against a bank is barred by an order allowing the bank's claim. *In re Baudoin*, 981 F.2d 736, 743-744 (5th Cir. 1993). Although an order was not entered in this case allowing the Secured Creditor's claim, reinstatement of its debt and a cure of all defaults is inconsistent with the reservation of a lender liability claim that could wipe out the debt altogether. *See also Sure-Snap Corp. v. Sun Street Bank & Trust Co.*, 948 F.2d 869 (2d Cir. 1991), where the Court barred the debtor from pursuing claims against a secured creditor, as the debtor's potential lender liability claims were never disclosed in the plan or disclosure statement.

The cases cited by the Debtor for the proposition that it can reinstate debt but still retain

---

[4] The Plan provides that the Secured Creditor, who is separately classified in Class 2, is unimpaired and deemed to accept the Plan based upon its receiving "[p]ayment of the amount necessary to reinstate [its] note and mortgage under section 1124(2) of the Bankruptcy Code, in full in cash on the Effective Date . . . . [and] [p]ayment pursuant to [its] note and mortgage thereafter."

liability claims against the holder of the debt are distinguishable.  In *In re Sulton Realty, LLC*, No 12-10119, 2012 WL 6681845, *3, *9 (Bankr. S.D.N.Y. 2012), the only issues that were reserved in connection with the reinstatement of debt were the issues of default interest and late fees, issues that are outstanding in this case.  *In re New York Skyline*, 432 B.R. 66, 81 (Bankr. S.D.N.Y. 2010), involved assumption of a lease, and the debtor asserted that lease assumption did not bar it from asserting contract claims against the counterparty.  The Court agreed, holding that assumption is a summary proceeding and does not require litigation of all issues relating to the contract at the time of assumption.  *Id.* at 82, *citing Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993), *cert. dismissed*, 11 U.S. 1026 (1994).  By contrast, plan confirmation is intended to resolve all issues related to the plan, and it is not a summary proceeding.  *See Heritage*, 160 B.R. at 378 n.5 (comparing the summary nature of lift stay litigation, where it is not mandatory to raise all claims, with the res judicata effect of a confirmation order).

   The Debtor points out that at the confirmation hearing, it raised the issue of the Secured Creditor's conduct in connection with its acquisition of the debt, and there was testimony on the issue.  Nevertheless, the only issue that this testimony related to, as far as the Court was aware, was the lender's misconduct and whether that would bear on the Debtor's liability for default interest.[5]  The Debtor stood mute when the Court found that the Plan satisfied the conditions to confirmation in § 1129 of the Bankruptcy Code, except for the issues of default interest, late charges and other costs of cure set forth above.

---

[5] At the November 15, 2012, Debtor's counsel stated that the biggest issue in the case was default interest. Tr. of Hearing of Nov. 15, 2012, at 11:17-18; he then went on to state "that the two sub-issues on default interest we believe are insolvency and lender misconduct." Tr. of Hearing of Nov. 15, 2012, at 13:7-8.

Even if it were not too late for the Debtor to change course and subvert its own plan, it should be noted that the testimony at the confirmation hearing hardly established that the alleged wrongdoing deprived the Debtor of its rights. The Debtor claims that a broker named Aaron Jungreis, who had acted as broker in connection with the Debtor's purchase of the property in 2008, and later represented the Debtor in attempting to facilitate a workout or settlement with Citibank, the original lender, conveyed confidential information on the Debtor's settlement position to the Secured Creditor's agents, and that as a result Citibank terminated negotiations with the Debtor and instead sold the loan to the Secured Creditor for $7.8 million, substantially less than its current face value. It is alleged that Jungreis was not only a faithless agent of the Debtor, but that he was an investor in a fund that owns the Secured Creditor's mortgage.

There is no question that the Debtor has raised a question as to Jungreis' liability for possible misuse of information he received in confidence from the Debtor, and nothing herein is intended to bar the Debtor from pursuing any claims against Jungreis. However, even assuming Jungreis provided the Secured Creditor with confidential information,[6] the Debtor has not explained how the breach caused the Debtor actionable harm or constituted misconduct sufficient to expunge or limit the Secured Creditor's claim.[7] All of the authority the Debtor cites

---

[6] Daniel Wrublin, the principal of the Secured Lender, denied this. He testified that a rent roll had been provided in 2008, three years before the transaction with Citibank, when Jungreis was acting as broker for the property, and this testimony is supported by the date of the rent roll itself (Ex. BB). Wrublin testified that he had had no further contact with Jungreis relating to the property until after the loan had been purchased from Citibank.

[7] The Debtor's position on liability seems to be based on the premise that Citibank refused to enter into a workout with the Debtor and instead sold the loan to the Secured Lender, and that this was caused by Jungreis' activity in concert with the Secured Lender. However, the Debtor had no contract with Citibank to modify the loan. There is no evidence in this record that Citibank was prepared to enter into a deal with the Debtor or that Citibank was not free to sell the debt to a third party. The Debtor notes that the Secured Creditor represented and warranted to Citibank in the contract for the purchase of the loan that it had not had any prior dealings or communications with the Debtor or its principals with respect to the loan or property, "except as previously disclosed to Citibank in writing." It is specifically asserted that Jungreis' conduct constituted a violation of this representation. However,

in its claim objection on the subject of good faith are cases relating to the foreclosure of residential properties subsequent to the financial collapse of 2008-2009. These cases are not apposite where the lender and creditor are sophisticated players in the market for commercial real estate. Nor is N.Y. CPLR § 3408 or the Federal Home Affordable Modification Program (HAMP), relating to settlement and conferences in connection with residential mortgage foreclosures, binding in the instant dispute.

As discussed above, the issue of the Secured Creditor's good faith is relevant to the claim for post-petition default interest, but the Secured Creditor has withdrawn this claim. The remaining claims that the Debtor seeks to reserve are barred by its own Plan.

*Conclusion*

Based on the above, the Debtor is responsible for payment of the following:

1. Interest at the non-default rate to the Effective Date of the Plan.

2. Prepetition Default interest of $ 291,488.

3. Attorney's fees in an amount to be determined.

4. Advances, taxes and similar charges, net of any taxes already paid.

At the time of the Confirmation Hearing, the Plan lenders had escrowed $1,925,000 in support of confirmation. In addition, the State court receiver was holding $594,597, some of which has been used for the payment of taxes. It is unclear whether the total amount in escrow is sufficient to make all necessary payments to the Secured Creditor, as well as to fund the priority claims, the down-payment on the supplier and general unsecured claims and the professional and

---

putting aside the denial by the principal of the Secured Creditor that he had any material contact with Jungreis, this representation was made to Citibank for Citibank's benefit. There is no indication that the Debtor was a third-party beneficiary.

administrative charges of the case.  Accordingly, in order to confirm the Plan, Debtor's counsel is directed, on or before April 10, 2013, to settle on the Secured Creditor's counsel a form of confirmation order which, among other things, specifies that payments to be made under the Plan and the source of payment.  Any party in interest may respond no later than April 19, 2013.  In the meantime, on or before April 1, 2013, the Secured Creditor's counsel should file a detailed statement for all legal fees sought, showing hours billed and billing rates.  The Debtor may respond in connection with its form of confirmation order.

       The Court will then be in a position to resolve any remaining issues and enter an order confirming the Plan.

Dated: New York, New York
       March 21, 2013

                                       **s/Allan L. Gropper**
                                       UNITED STATES BANKRUPTCY JUDGE